Olin Alexander v. Commissioner.
Alexander v. Commissioner
Docket No. 27440. TC Memo. 1955-29.
United States Tax Court
T.C. Memo 1955-29; 1955 Tax Ct. Memo LEXIS 314; 14 T.C.M. (CCH) 100; T.C.M. (RIA) 55029; January 31, 1955
*314 During the taxable years 1944 through 1947 petitioner was the proprietor of a liquor store. He also purchased and sold five houses and built and sold two others during that period. The gross sales of his liquor store were not properly entered on the books or on petitioner's returns, and petitioner failed to report any of the gains realized on the sale of the houses. Petitioner sustained a loss in 1942 on the sale of a farm which he had purchased many years before and was operating at the time of the sale. Held, deficiencies for each of the taxable years (with some adjustments) properly determined by using the net worth method. Held further, at least part of the deficiency for each of the taxable years was due to fraud with intent to evade tax and the statute of limitations has not run on any of those years. Held further, petitioner is not entitled to a capital loss carry-over under section 117(e) of the 1939 Code. Milton H. Schmidt, Esq., 808 Atlas Bank Building, Cincinnati, Ohio, for the petitioner. Robert E. Johnson, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax of the petitioner and additions to tax under section 293(b) of the Internal Revenue Code of 1939, as follows: 50% Addition
Year
Deficiency
to Tax
1944
$ 544.11
$ 272.06
1945
5,603.53
2,801.77
1946
4,483.67
2,241.84
1947
7,651.00
3,825.50
The questions for decision are: 1. Whether the assessment of tax for the year 1944 is barred by the statute of limitations; 2. Whether the respondent correctly determined deficiencies in petitioner's income tax by use of the net worth increase method; 3. Whether part of the deficiency in the income tax of petitioner for each of the taxable years involved was due to *316 fraud with intent to evade tax; and 4. Whether petitioner was entitled to a capital loss carry-over. Findings of Fact The stipulated facts are so found. Petitioner, Olin Alexander, resides in Lexington, Kentucky, and filed his individual income tax returns for the years 1944 to 1947, inclusive, with the collector of internal revenue for the district of Kentucky. In 1919 petitioner and his brother, Willis Alexander, purchased a 98 acre farm in Woodford County, Kentucky, for $13,500. They sold eight or nine acres out of the tract for $1,390 shortly thereafter. They built a barn, stripping room, meat house, enlarged the old barn, dug a pond, put up fences, and cleared, smoothed and improved the land at a total cost of about $9,400. Willis sold his half interest in the farm to petitioner in 1922 for $10,750. Petitioner paid his brother $3,750 in cash and paid the rest by assuming the liabilities. Petitioner moved to Lexington in 1925 and from that time until June 1942 the farm was operated by sharecroppers. Petitioner returned to the farm in June 1942 and operated the farm until he sold it in December 1942 for $9,200. Petitioner and his wife, Louise, were married in 1925. They *317 have one son who was born in 1939. Prior to her marriage Louise had worked for seven years. Petitioner entered the construction business in Lexington in 1925. He built houses for sale. Petitioner sold the business in 1930. From 1930 until June 1942 petitioner worked for the Metropolitan Life Insurance Company in Lexington. He received as wages during the last six years while working for that company between $2,000 and $3,000 per year. During 1943 petitioner worked in Detroit for the Excello Corporation and the Packard Motor Car Company. Petitioner's wife and child remained in Lexington while petitioner was in Detroit. Petitioner purchased a small retail package liquor store in February 1944. The store, called the Brown Liquor Dispensary, was located on a dead end street in a negro residential neighborhood of Lexington. Petitioner paid $3,583.08 for the store, including inventory on hand, fixtures, and name. He operated the store as a sole proprietorship from the time of its purchase continuously throughout the taxable years involved. The store was open from eight in the morning until ten-thirty at night on week days and until midnight on Saturdays. Petitioner operated the store *318 himself with some help from his wife. He occasionally hired outside help. Whiskey, gin, rum, and wine were sold, but no beer. Sales were mostly by the bottle but not infrequently by the case. Petitioner hired Hugh Mobley, who had been the bookkeeper for petitioner's predecessor, to set up and maintain the books. There was a cash register in the store upon which sales were rung up. As the cash register would not ring up a sum higher than $9.99, several rings were necessary to record a sale in excess of that amount. All sales rung up were totaled each day and the tape or the lower portion thereof showing the total was retained. Mobley used these tapes in posting the books. Mobley maintained a set of single entry books for petitioner showing daily sales, purchases, and expenses. If these books had been accurately maintained, they would have been adequate. However, not all of the sales were recorded on the cash register tapes which were used for entering the sales on the books. In order to show higher yearly sale figures, which because of the omissions were unbelievably low, various daily sales figures were changed. The changes were made by writing over the first digit in the sales *319 figure so as to increase it by an even number of hundreds of dollars. For example, each of the Friday sales figures during the first ten months of 1947 have apparently been changed from a sales figures of between one and two hundred dollars to a sales figure of between four and five hundred dollars by changing the "1" to a "4". Similar changes appear to have been made in the daily sales figures for the years 1944 and 1945. The sales figures for the year 1946 were recopied; and, consequently, no changes appear in the sales figures for that year. All of the changes had the effect of increasing reported sales except for changes in the sales figures for the five Saturdays before Christmas in the year 1945 which appear to have been substantially decreased. All of the changes were made by Mobley at petitioner's direction or were made while the books were in petitioner's possession. As sales were not accurately recorded the books do not accurately or adequately reflect income for any of the taxable years involved. Petitioner entered into a number of real estate transactions in the taxable years involved. He purchased, remodeled, and sold three houses in 1945 and one in 1946. All of the *320 houses were held less than six months and he realized total gains on these transactions of $6,602.75 in 1945 and $2,359.09 in 1946. He purchased another house on July 15, 1946, which he remodeled and sold on September 25, 1947, for a gain of $2,111.54. He also began the construction in 1947 of six houses known as the Paris Pike Subdivision. Two of the houses were completed and sold in 1947 for a gain of between $200 and $900. Also petitioner received rental income in the amount of $320 in 1945 and $142.66 in 1946. None of the above gains or rents were reported or disclosed prior to the investigation of petitioner's tax returns. Petitioner did not report these transactions because he was a small operator and thought he would not be investigated. Petitioner, his wife, and son lived in two rooms, plus kitchen and bath, behind the liquor store from the time it was purchased until April 1946. At that time they purchased, remodeled and moved into a house in a good residential neighborhood where they lived throughout the remainder of the taxable years involved. They had stored some of their furniture with petitioner's parents prior to the beginning of the taxable years, a part of which *321 they sold in 1946 for as much as $600. During the taxable years petitioner's family obtained part of their food without cost from his parent's garden. In 1946 petitioner's wife purchased some chickens for $119.95 at an auction held by her father. She had entered the bidding in order to increase the bid price. Not wanting the chickens, she resold them for approximately the price she had paid. On April 11, 1947, $1,000 was loaned to petitioner's wife by her father. She repaid him $900 on June 27, 1947. On December 31 of the years 1943 through 1947 the balances in bank accounts in the name of petitioner or his wife and total checks outstanding were as follows: 1943
1944
1945
1946
1947
Bank Balances
$3,242.61
$4,842.59
$13,720.14
$4,466.09
$6,703.75
Total Checks Outstanding
196.54
1,171.40
1,433.22
1,024.28
Petitioner's net worth increased during the taxable years as follows: 1944
1945
1946
1947
$2,548.11
$12,950.82
$10,464.90
$17,373.38
Personal expenditures by petitioner and his family during the taxable years were as follows: 1944
1945
1946
1947
$1,744.38
$2,936.07
$7,126.63
$6,924.41
*322 Petitioner realized a long-term capital gain in 1947 of $2,111.54 only half of which, or $1,055.77, is taxable. Petitioner's adjusted gross income, reported adjusted gross income, and the amount of adjusted gross income which was unreported during the taxable years were as follows: 1944
1945
1946
1947
Adjusted Gross Income
$4,292.49
$15,886.89
$17,591.53
$23,242.02
Reported Adjusted Gross Income
3,692.23
4,391.30
6,386.91
6,183.48
Unreported Income
$ 600.26
$11,495.59
$11,204.62
$17,058.54
The income for each of the above years was understated and a part of the resulting deficiencies for each of the years was due to fraud with intent to evade tax. Opinion The asserted deficiencies were determined by respondent by computing the increase in net worth of petitioner and his family for each of the years 1944 through 1947, and adding thereto personal expenditures less one-half long-term capital gains, thus arriving at amounts purporting to be adjusted gross income for each of the taxable years. Petitioner challenges the propriety of resorting to this method of determining income under the circumstances here present. He correctly contends, *323 at least as to his liquor store business, that he kept books which would clearly reflect the income of the business if accurately maintained. Under these circumstances the Commissioner is precluded by section 41 of the 1939 Code from using another method of accounting in computing petitioner's net income. But where the net worth computation reveals a substantial gap between reported income and the increase in net worth or where the books are otherwise shown to have been inaccurately maintained, section 41 does not bar the use of the net worth method, which is not a method of accounting, as a guide for determining the amount of income actually received. Estate of George L. Cury, 23 T.C. 305 (Nov. 23, 1954), Here sales were shown to have been inaccurately recorded and in the years 1945, 1946, and 1947 petitioner's net worth increase and expenditures greatly exceeded his reported income. Some of the items necessary in using the net worth method have been stipulated. Evidence was introduced as to contested items and we have made findings accordingly. Our findings are based not only upon observation of the witnesses as they testified, but upon careful study of the entire *324 voluminous record. While we shall not attempt a complete analysis of our findings, we shall comment briefly upon some of the items. Inventory. On his income tax return for the year 1947 petitioner reported a closing inventory of $7,535.70. Respondent's agents, having been informed by petitioner that the physical inventory sheets had been destroyed, used the above inventory figure in computing petitioner's net worth increase. Petitioner introduced in evidence three sheets which he testified represented his physical inventory on December 31, 1947. These sheets purportedly show a closing inventory at retail of $6,152.02. Petitioner further testified that he determined the mark-up to be $1,383.68; but, instead of subtracting this figure as he should have, he added it to the closing inventory at retail which gave him the figure reported. If petitioner correctly testified as to the facts, petitioner's net worth increase for 1947, as computed by respondent's agents, was excessive by twice $1,383.68. In our opinion the sheets introduced in evidence are not petitioner's bona fide closing inventory for the year 1947. The entries on each of the three sheets end on the next to the last line, *325 and there is no short page as would normally be the case if all the sheets were present. Also, the same items appear twice on the sheets, which indicates, that the three sheets are not all part of the same inventory. The figures used indicate a mark-down of 22.4914743 per cent and a mark-up of 29.0180649 per cent. The use of such percentage figures in computing closing inventory would be highly unlikely. Also, the inventory was purportedly taken on a bottle basis, and the minimum retail mark-up in Kentucky on sales of less than a case was at that time 33 1/3 per cent. Furthermore, a number of items purchased only shortly prior to December 31, 1947, do not appear on the inventory. And, computing petitioner's closing inventory by adding petitioner's opening inventory to purchases and deducting the reported sales, reduced by the percentage mark-down allegedly used, gives a figure for closing inventory of nearly $20,000. These circumstances, and the fact that petitioner's testimony was contradicted on other points by documentary evidence, convinces us that the respondent did not err in refusing to reduce the closing inventory originally reported by petitioner. Undeposited cash. Petitioner *326 contends that his wife had $15,350 in cash in their safety deposit box at the beginning of 1944. Petitioner's wife testified that she saved $4,000 prior to her marriage in 1925; was given $6,000 by petitioner in 1930 when he sold his construction business; saved an additional $3,000 out of petitioner's wages during the next twelve years; and received $2,350 when the farm was sold in 1942. She stated that prior to 1943 the cash hoard was kept at home in her cedar chest. Her story is supported by the testimony of her niece, who claimed to have counted the money in 1944 when she was twelve years of age. Contradicting the testimony of petitioner, his wife, and her niece are financial statements signed by petitioner and his wife on November 9, 1938, and January 21, 1944, showing total cash on hand or in the bank of $50 and $3,229.46, respectively. On August 17, 1952, petitioner signed a financial statement showing cash on hand or in the bank of $50. And he submitted a statement to the respondent's agents on April 14, 1949, stating that he had cash in the bank on January 1, 1944, in the amount of $3,100 (undoubtedly referring to the balance in a bank account in the name of his wife in *327 the amount of $3,189.39), but making no mention of the $15,350 which he contends his wife had in their safety deposit box. Petitioner had been instructed, prior to submitting the latter statement, to include all assets owned by his wife. In 1942 two small bills incurred by petitioner's wife remained unpaid until one was turned over to a collection agency and suit was brought on the other. Also the manner of living of petitioner and his family and the fact that petitioner was forced to mortgage his farm are inconsistent with the existence of a large amount of cash. We think that these facts effectively refute the implausible and unsupported testimony of obviously prejudiced witnesses upon which petitioner relies to establish the existence of the cash hoard. Farm implements and small tools. Petitioner testified that in 1945 he sold farm implements and small tools which he had acquired prior to 1944 for $1,955.02 and $242.50, respectively. The farm implements sold were allegedly used on the farm which petitioner sold in December 1942. The only equipment which was seen by the purchaser of the farm was an old plow and wagon which he valued at around $125. On a financial statement signed *328 and submitted by petitioner on August 17, 1942, only four months prior to the sale of the farm, he valued his farm equipment at $245. On a similar statement signed on November 9, 1938, petitioner valued such equipment at $100. Petitioner did not describe the equipment, state where it was stored prior to its sale, or name the buyers of the equipment. It is also unlikely that a person would let valuable farm equipment lie idle and rusting for three years before selling it. For these reasons we were unconvinced by petitioner's unsupported and self-serving testimony with regard to the sale of the farm equipment. And similarly we are unwilling to accept petitioner's wholly unsupported testimony regarding the alleged sale of the small tools. Furniture. We have found that petitioner sold some furniture in 1946 for $600. Petitioner contends that he realized $5,830.30 from the sale of furniture. His contention is based upon the testimony of his wife, that, at a time when they had just purchased a large home, she sold for $3,600 furniture which had been stored with petitioner's parents since 1942, purchased new furniture for around $4,500, and resold a part of the furniture purchased for *329 about $2,000. This testimony is wholly unsubstantiated. Also, except for two bedroom suites which petitioner's wife claims to have sold for $600 and for which we have given petitioner credit, none of the furniture was described nor was the witness able to name any of the purchasers. We have not been persuaded that more than $600 was realized from the sale of the old furniture. And, if any of the new furniture was resold, we are convinced that the amount realized did not exceed the difference between the amount of furniture which petitioner's wife claims she purchased and the amount which respondent's agents charged her with purchasing. Gifts. Respondent determined that $119.95 and $900 which petitioner's wife paid to her father in 1946 and 1947, respectively, were gifts. The determination was based upon petitioner's answers when first questioned about these payments. We have been convinced, however, by the testimony of petitioner's wife and by certain documentary evidence, that the $119.95 was paid for chickens which were resold and the $900 represented the repayment of a loan. Personal expenses. For the purpose of computing the amount of petitioner's personal and family expenses, *330 respondent was able to determine the amount of petitioner's expenditures for taxes, insurance, home, clothing, travel, and medical care. To these expenses he added all checks for personal items other than those listed above, all "unidentified checks", all checks made out to cash, and a lump sum representing all other cash expenditures. We are convinced that a number of the checks classified as "unidentified" or made out to cash were not personal expenditures but were used in the business. And, to the extent they were personal checks, it would reduce the lump sum amount which should be added to cover all other personal and family expenses. For this reason we have eliminated the amounts included for "unidentified checks" and checks to cash, and have added a lump sum amount to cover those personal and family expenses which were not itemized. While we have no direct evidence as to the precise amount of petitioner's additional personal and family expenditures, the record does afford a fairly complete picture as to their scale of living. With this as a guide we have found that the additional expenses of petitioner and his family were $1,000 in 1944 and 1945 and $2,000 in 1946 and 1947. *331 Fraud. We have found that a part of the deficiency for each of the taxable years 1944 through 1947 is due to fraud with intent to evade tax. We think our finding is supported by clear and convincing evidence. It is apparent that numerous changes have been made in petitioner's books. These changes, while increasing the amount of income shown by the books, indicate that a large number of sales were not properly entered on the books and that income was thereby understated. The amounts of gross sales reported by petitioner were unbelievably low, considering his volume of business and the minimum mark-up required by law. Furthermore, inventory records for only one year were produced at the trial and they did not represent the actual inventory taken. And, except for one year, there are substantial differences between income reported and what we have found to be the correct income. Also, petitioner did not report approximately $11,000 which he realized on the sale and rental of real estate because he was a small operator and did not think he would be investigated. Petitioner admits that the first excuse he offered for failing to report this income was false. These and many other facts *332 establish by clear and convincing evidence that the deficiencies were due, at least in part, to fraud. Accordingly, the statute of limitations has not run on any of the years involved, and respondent properly determined that petitioner was liable for 50 per cent additions to tax under section 293(b) of the 1939 Code. The remaining issue for decision is whether petitioner has a capital loss carryover to the taxable years involved as a result of his sale of the farm in December 1942. At the time of its sale the farm was being operated by petitioner for profit. The farm was "real property used in the trade or business" within the purview of sections 117(a)(1) and 117(j)(1) of the 1939 Code, as amended by the Revenue Act of 1942. Section 117(a)(1) provides that such property is not a capital asset, and section 117(j)(2) provides that losses on the sale of such property (to the extent they exceed gains) shall not be considered as "losses from sales or exchanges of capital assets." Therefore, petitioner did not have a "net capital loss" in 1942 to carry over to the five succeeding taxable years under the provisions of section 117(e) of the 1939 Code, as amended by the Revenue Act of 1942. *333 Nor would the alleged loss give rise to a net operating loss deduction under section 122 of the 1939 Code. Joseph Sic, 10 T.C. 1096, affd. (C.A. 8) 177 Fed. (2d) 469, certiorari denied 339 U.S. 913. Decision will be entered under Rule 50.